## BLACKWELL OIL & GAS CO. et al. v. WHITED.

No. 9761—Opinion Filed Jan. 8, 1921.

Rehearing Denied March 29, 1921.

(Syllabus.)

1. **Oil and Gas—Action to Forfeit Lease—Equity Rights.**

A suit, the primary and only purpose of which is to establish a forfeiture as matter of record and to cancel the thing forfeited—in this instance a lease—is a suit to give effect to, and therefore to aid in, the enforcement of a forfeiture, and the equity which it presents must be strong enough to overcome the general indisposition of courts of chancery towards granting such relief.

2. **Abandonment—Assignment of Property —What Constitutes.**

To constitute abandonment in respect of property, there must be a concurrence of the intention to abandon, and an actual relinquishment of the property, so that it may be appropriated by the next comer. In determining whether one has abandoned his property rights, the intention is the first and paramount object of inquiry; for there can be no abandonment without the intention to abandon.

3. **Oil and Gas—Cancellation of Lease for Abandonment—Judgment—Evidence.**

Record examined, and held, that the judgment of the trial court canceling the lease for abandonment, is not supported by the evidence, and the same is reversed and the cause remanded, with directions.

Error from District Court, Kay County; W. M. Bowles, Judge.

Action by Rose Whited against the Blackwell Oil & Gas Company and another to cancel oil lease. Judgment for plaintiff, and defendants bring error. Reversed and remanded.

H. S. Gurley and Dale & Bierer, for plaintiffs in error.

C. Robert Belatti, for defendant in error.

JOHNSON, J. This is an appeal from the district court of Kay county; Hon. W. M. Bowles, Judge.

The record discloses that on June 10, 1907, Jacob K. Hines and Rose Hines, his wife, leased to the Union Oil & Gas Company the northeast quarter of section 10, township 27 north, range 1 west I. M. That a short time prior to the execution of the lease Jacob M. Hines deeded to Rose Hines the north 80 and Rose Hines quitclaimed to Jacob M. Hines the south 80, and sometime after the execution of the lease the above-named parties were divorced and Rose Hines restored to her maiden name of Rose Whited, who was plaintiff below in this case, defendant in error here; and she still lives on the property alone, never having married again. That some two or three years after the execution of the lease, J. W. Patterson bought the south 80 from Jacob M. Hines. The original lease is set out as "Exhibit A" to the petition, and was filed for record in Kay county on the 26th day of June, 1907.

The lease recites a cash consideration of $1, and reserved to the lessors a royalty of one-tenth of all the oil and minerals produced on the premises, and contains the following provisions:

"If gas only is found in quantities large enough to transport, the parties of the first part are to receive fifty dollars per year for the product of each and every well so transported and also free gas for dwelling on the above described land for heating and lighting purposes.

"If no well is commenced within sixty days from date of this lease on the above land then this grant shall become null and void. * * * This lease shall be operative for the period of twenty years from date of this lease, or as long as gas or oil is found in paying quantities in and upon said land.

"It is understood between the parties to this agreement that all conditions between

the parties hereunto shall extend to their heirs, successors, executors and assigns."

On the 15th day of May, 1917, and at the commencement of the trial in the court below, the parties entered into the following stipulation in open court:

"It is hereby stipulated, in open court, between counsel for plaintiffs and defendants that cases No. 5933, J. W. Patterson, plaintiff, v. Blackwell Oil and Gas Company et al., defendant, and case No. 5934, Mrs. Rose Whited v. Blackwell Oil & Gas Company et al. in the district court of Kay county, Oklahoma, both being found on the same lease, are hereby consolidated, without prejudice to the rights of either party, for the purpose of trial, and without prejudice of the rights of the plaintiffs to present their separate interests and claims, and that the evidence shall all be introduced together and shall all be considered together so far as it is applicable to the rights of both and all parties to the litigation.

"The Court: The stipulation is approved with the understanding that the agreement to consolidate shall not bar the rights of either party and all the evidence shall be considered as applicable to either or both cases."

Thereafter counsel for the plaintiff and defendants, respectively, made an exhaustive opening statement, the essential portions of which will disclose the theory upon which the case was tried, and, in substance, were, on the part of the plaintiff, as follows:

"We have three distinct theories upon which we contend this lease should be canceled. First: The surrender clause, which gives the lessor the same rights as the lessee, after having abandoned the well and no longer paying any rental. Second: The second theory is on the straight theory of abandonment; that they abandoned the well and refused to pay anything further on it, and the evidence will further show that they not only abandoned the well, but that they pulled the casing and removed everything from it. There is nothing there now but a hole in the ground, all caved in, and our third theory is this: That the provision that this lease shall be for twenty years or as much longer as oil or gas is found in paying quantities— the words, 'or as much longer as oil or gas is found in paying quantities' are words of limitation on the twenty years; that when they once produce oil or gas in paying quantities, that then the term of the lease will be not twenty years but as much longer as oil or gas is found in paying quantities, and when oil or gas is no longer found in paying quantities, or as in this case, the well exhausted, which they admit in their answer was some four or five years ago and abandoned the premises, that unless oil or gas was longer found in paying quantities, that terminated the lease by its own terms.

"The Court: I understand your proposition.

"Mr. Bellatti: Upon showing this state of facts. "We will desire to have the lease canceled."

Counsel on behalf of defendants, in substance, stated:

"The lease provides for the furnishing of free gas to the lessor for heating and lighting purposes, and the evidence will show that the residence on this tract of land is located on the north eighty and that the residence is now occupied by Mrs. Hines, or Mrs. Whited, Mrs. Whited being the same person as Rose Hines, the party signing the original lease as the wife of Jacob M. Hines, and that she has at all times been furnished gas free of charge for her use at her residence in the north eighty, and that, so far as we know, she is receiving it now; that we have done nothing to prevent her from receiving it; that there is a line running from the pipelines of the Blackwell Oil and Gas Company to the residence of Mrs. Whited; that after the well ceased to be used which was located on these premises, that then her residence was connected with the gas pipe line of the Blackwell Oil & Gas Company, and that she has free access to that gas at all times; and that proof will show that she has at all times been using and accepted the gas under the terms of the lease, and that after Mr. Patterson became the owner of the fractional south eighty, he was furnished free gas for his own use in the city of Blackwell and has at all times and is now using gas for his residence in the city of Blackwell in any quantity or in any amount that he can use or will use for all of his stoves and light in his residence, and that this lease became a fully performed lease by the action of the Union Gas and Oil Company in drilling this gas well.

"And the evidence will further disclose that neither Jacob M. Hines, Rose Hines or Whited, nor J. W. Patterson, either by themselves individually or through others for them, ever requested or demanded or asked that either the Union Oil & Gas Company, or the Blackwell Oil and Gas Company, or the Duluth and Oklahoma Oil Company make any other or further development on the premises, and that the first notice that either of the companies ever had of any dissatisfaction on the part of the landowners was upon the receipt, sometime last winter, of a notice signed by the respective owners of these lands, notifying the company that the lease was terminated by the act of the lessors, which, of course, the lessees did not agree to or in any way concur, but were willing to and did thereafter continue to furnish gas under the terms of the lease, which shows clearly and plainly that none of the lessees had any intention of abandoning the lease, and that Mr. Patterson, when he accepted gas free of cost at his residence in the city of Blackwell, did so at that time in lieu of any

further development. That at that particular time there was no development which would have warranted under the conditions of the field known as the Blackwell oil and gas field further prospecting on this land.

"The evidence will further show that the Blackwell Oil & Gas Company and the Duluth and Oklahoma Oil Company have spent several hundred thousand dollars in what is known as the Blackwell oil and gas territory; that no oil in paying quantities has ever been found and produced in the near neighborhood of this tract of land; that the Blackwell pool was originally discovered in what is known as the Swenson and Alberti wells, some ten or eleven miles to the northeast of this tract of land, and the Alberti well, I believe, was brought in in the year 1915, and that these companies since that time have been developing out and prospecting from the oil discovered in that well for the purpose of ascertaining the limits of that pool of oil, and for that purpose have spent, as I said, several hundred thousands of dollars developing, and that if conditions warranted it and the pool should be proved to extend to this tract of land, of course, development thereby will be assured on these premises; that the oil is found in this field at the depth of about thirty-four or thirty-five hundred feet, and that the cost of wells at this time, to a depth of thirty-four or thirty-five hundred feet is approximately fifty thousand dollars.

"That neither the lessees nor the lessors ever treated this lease as abandoned and the lessees had no intention of abandoning the lease; that the lessors received benefits under the terms of the lease and so treated the lease 'as in full force and effect; that the evidence will show that the lease is now in full force and effect and is for a period of twenty years."

The court made no separate findings of fact and rendered a judgment in favor of the defendants in the Patterson case, from which there was no appeal, and rendered a judgment in favor of the plaintiff in the Whited case, canceling the lease as to the north 80 acres, from which judgment this appeal is being prosecuted.

The defendants' assignments of error are:

1. "The court erred in not sustaining the demurrer of the defendants to the petition of plaintiff.

2. "The court erred in not sustaining the demurrer of the defendants in the lower court to the evidence offered and introduced by the plaintiff in the trial court.

3. "The trial court erred in not sustaining objections of the defendants to the introduction of incompetent, irrelevant, and immaterial evidence by the plaintiff, to all of which the defendants made objections at the time of introduction.

4. "The court erred in not finding from the evidence in favor of the defendants and against the plaintiff, and in not rendering judgment in favor of the defendants and against the plaintiff, and said judgment is not sustained by the law or the evidence.

5. "The court erred in decreeing a cancellation of the oil and gas mining lease held by plaintiffs in error on the land of the defendant in error, and in rendering judgment in favor of the defendant in error and against the plaintiffs in error.

6. "The lower court erred in overruling the motion for new trial of the plaintiffs in error, defendants below, and in not setting aside the judgment and decree of said court in said cause, and in not rendering judgment in favor of the defendants and against the plaintiff."

Counsel for defendants say in their brief:

"For brevity of specification we are taking up and presenting in one proposition the first five assignments of error herein above set forth, for the reversal of this cause; and our arguments will be equally applicable to one and all of the above specifications and are intended to be applied to these five assignments of error.

"The big question is, what are the rights of plaintiffs in error, in this lease which they hold on this entire tract of land, substantially a quarter section, and which the trial court refused in the double case, tried to cancel as to the south half and ordered canceled as to the north half? If this lease was good because the defendants below had complied with it upon half of this land, then it was good because they had complied with it as to all. If we have made payment under this lease to the south half of this land, then we have made payment, we claim, as to all. This lease was an entire contract on this entire quarter section of land. It was made by Rose Hines, now Rose Whited, defendant in error, on the 10th day of June, 1907, and it provided that it should 'be operative for the period of twenty years (20 years) from date of the lease, or as long as gas or oil is found in paying quantities in and upon said land,' and it was made upon a consideration of furnishing 'free gas' and commencing a well 'within sixty days from the date of this lease.' "

Counsel for plaintiff, in stating their counter proposition, says in his brief:

"Defendants' contention in this case, as I understand it, is that their term does not expire for twenty (20) years, but my contention is that as soon as oil or gas was produced from the premises in paying quantities that the duration of the terms was fixed for a period only during which said oil and gas was produced in paying quantities on the premises. * * * That under the clause fixing a specified term and as much longer as oil and gas is found in paying quantities, where no attempt is made to

develop for oil, but gas is obtained for a considerable period of time, the lease expires upon the failure of the gas well to produce in paying quantities."

The record discloses that the lease was executed June 10, 1907; that the well on the south 80, or Patterson tract, near the south line of the north 80, was not only commenced within 60 days from the date of the lease, but was actually drilled and gas produced in paying quantities within the 60 days, and the gas was connected with the house on the premises, the north 80, and was used by Mrs. Whited for about a month and a half, when she was connected with the pipe line of the defendants and continued to use the gas uninterruptedly until the 20th of November, 1916, when she voluntarily cut off the gas and served a notice upon the defendants, which was as follows:

"Blackwell, Oklahoma,

" November 20th, 1916.

"The Blackwell Oil & Gas Company and Duluth & Oklahoma Oil Company, Gentlemen: You are hereby notified that as the owner of the north half of the northwest quarter of section ten (10), township twenty-seven (27) north, range one (1) west I. M., Kay county, Oklahoma, I exercise my right to terminate the lease you hold on said premises, and I hereby demand a surrender of same. I exercise this right under the following terms of the lease, to wit: 'It is further agreed that the lessor, in consideration of the covenant and agreements herein contained, agrees that the lessee, his heirs or assigns may at any time surrender up this lease, and remove all his property, by delivering same back to the lessor, his heirs, or assigns, endorsed with a surrender thereof signed by him or his assigns, and be forever discharged and released from all moneys, due or to become due from all obligations accrued or to accrue under this lease.'

"I hereby exercise the same right and hereby release you from all obligations to me under the lease now due or to become due, and release you from all rights and privileges which I have or might have under said lease. I do not claim any right to gas under said lease, and hereby notify you that I have quit using your gas, and claim no right to gas.

"I also demand a release of the lease on account of your abandonment of the premises and the lease, and on account of the lease being void on account of said abandonment and because said lease is unilateral and void for want of mutuality.

"You are also notified that unless you notify me or my attorney, C. Robert Belatti, of Blackwell, Oklahoma, within twenty-four hours after receipt of this notice that you will release said lease, that suit will be filed without further notice.

"Yours truly,
"Rose Whited."

And this suit was filed on the 1st day of December, thereafter, and the Patterson suit was filed at the same time, the testimony showing that the defendants paid to the plaintiff Patterson the royalty of $50 upon this well for three years and a half; that during that time he lived in the city of Blackwell and received gas from the defendants for which he paid and at the expiration of the three and a half years upon which royalties were paid upon the well he ceased to pay for gas, but continued to receive and use the same up to the time of the trial, and concerning which he testified:

"They commenced furnishing me free gas at my residence in Blackwell when they quit paying me for the well on the land—at the same time. I have had free gas ever since. I haven't gone over there and offered to pay for it. I stopped paying for gas at the time they quit paying me for this well. The change was made at that time. They were paying me $50 a year and I was paying my gas bill—they changed around and I never did pay any more gas bill and I got free gas from that time. I am using gas now in the same way and I haven't offered to pay anything for it. My house is a five-room house with two stoves, cook and heating stoves, and gas lights. I have used no other fuel for the last five years except the natural gas furnished me by the Blackwell Oil & Gas Company. I am using that exclusively and was so doing when I filed this action. There is no meter attached to it; we use it as we need it, night and day. I wouldn't have been entitled to free gas in town unless it was furnished under the terms of this lease. I never expected to pay for it unless they paid me $50 a year. Q. Well, you got the gas? A. I got the gas. Q. You are still taking it under the lease, aren't you? A. Yes, sir. Q. At this time? A. Yes, sir."

Mrs. Whited testified:

"Q. I will ask you, Mrs. Whited, how long you received that gas? A. I received it from that time until the 20th day of November, 1916. Q. Last fall? A. Yes, last fall. Q. At that time did you cut the gas off? A. Yes, sir."

She testified that defendant quit using the gas well about four or five years ago and pulled the casing in July or August—about August 1, 1916. The officers of the defendant testified that the well quit producing gas and that they pulled the casing to be used in another portion of the field; that they never intended to abandon the lease premises in question, but had been continually developing the field from production in the direction

of the leased premises; that they had drilled numerous wells to the sand to a depth of thirty-four or thirty-five hundred feet at an expense of $35,000 to $50,000, on the drilling of which was expended more than $200,000; that they would have drilled any offset well to this property in order to protect the same from drainage if any had been necessary; that the only producing well was some five miles from this property and that a short time before the notice was served by the plaintiff, Whited, a well had been drilled by another company to a considerable depth about one mile from these premises and it was reported the same contained a show of oil and that very soon thereafter they received the above notice from plaintiff and these suits were filed.

It is clear from the record that the plaintiff by her own act separated this tract of land into two parts, she taking the north 80 and her husband taking the south 80. She retained the north 80, on which she was furnished free gas from the summer of 1907 to November 20, 1916, nearly ten years. Her husband sold his half of the land and his grantee was furnished free gas under this lease up to November 16, 1916, when he arbitrarily also attempted to cancel this lease as to his part of the land, but he did not let go of the gas and continued to get it up to the time of the trial and judgment, and is getting it at the present time, as the record shows.

The well drilled on this land played out in about three years, during which time, the well being on the south 80 of the land, Patterson received $50 a year royalty from this well and then in lieu of this royalty and under the lease he also was furnished free gas. The well having become exhausted, a few months before this attempted cancellation of this lease the casing was pulled in order to be used by the defendants in their very extensive development of this oil territory toward this land, in other wells. These defendants were expending at the time the suit was brought, and had expended, $200,000 in numerous prospecting wells in the near vicinity of this land.

This testimony of the defendants was not controverted by any proof offered by the plaintiff. The testimony showed without dispute that the defendants continued to furnish free gas to her upon the premises until a few days before she brought this suit, at which time she voluntarily cut off the gas, and continued to furnish free gas to Mr. Patterson up to the time of the trial. These circumstances tended to corroborate the testimony of the officers of the defendants that they had no intention of abandoning the lease on this tract of land. The fact that after

the execution of the lease by Hines and wife upon the tract of land they partitioned the land between themselves, and Mr. Hines conveyed his part to Mr. Patterson, did not affect the rights of the defendants in the lease as originally executed, nor did it convert the lease from one lease upon the entire tract to two leases upon two separate tracts. Such has been the holding of this court in numerous cases.

In the case of Pierce Oil Corporation v. Schacht, 75 Okla. 101, 161 Pac. 731, where the parties there, as here, divided or sold the leased premises, the court said:

"This fact does not make the lease a separate lease upon each tract of land, but the same remains a lease upon the entire tract of land, and the drilling of a gas well upon any portion thereof and the payment of the royalty on the gas well as provided in the lease to the owner of the portion of the land where said gas well is found, extends the life of the lease upon the entire tract of land."

This court held to the same effect in the cases of Jens-Marie Oil Co. v. Rixse et al., 72 Oklahoma, 178 Pac. 658; Gypsy Oil Co. v. Cover, 78 Okla. 158, 189 Pac. 540.

It is clear from the pleadings of the plaintiff and opening statement of counsel, and the record as a whole, that the plaintiff relied for the cancellation of the lease upon two propositions: First, the surrender clause; and, second, abandonment of the lease. At the time of the commencement of the action for cancellation and the trial of the cause in the court below, the rule announced by this court in Brown v. Wilson, 58 Okla. 392, 160 Pac. 94, was in force, but the rule there announced has since been overruled by this court in the cases of Rich v. Doneghey, 71 Oklahoma, 177 Pac. 86; Northwestern Oil Co. v. Branine, 71 Oklahoma, 175 Pac. 533; Maud O. & G. Co. v. Bodkin, 75 Okla. 6, 180 Pac. 959; Magnolia Petroleum Co. v. Saylor, 72 Oklahoma, 180 Pac. 861.

This proposition has been abandoned by counsel for plaintiff, concerning which they say in their brief:

"We, of course, do not urge the surrender clause since the overruling of the case of Brown v. Wilson. As to the proposition of abandonment we desire to submit the following authorities and thus state this proposition: 'Where lessee enters upon the premises demised, and drills one or more unproductive wells and then abandons the lease, lessor may declare a forfeiture, retake possession of the premises, and procure a cancellation of the lease as a cloud on his title, upon the grounds of abandonment' "—citing in support thereof: Parish Fork Oil Co. v. Bridgewater Gas Co., 51 W. Va. 583, 42 S. E. 655; Steelsmith v. Gartlan. 59 W. Va. 27,

29 S. E. 976; Munroe v. Armstrong, 96 Pa. 307; Eventure Oil Co. v. Fretts, 152 Pa. 451, 25 Atl. 732; Florence Oil Co. v. Orman, 19 Colo. App. 79, 73 Pac. 629; Rawlings v. Armel, 70 Kan. 778, 79 Pac. 683; Lowther Oil Co. v. Miller-Sibley Co., 53 W. Va. 501, 44 S. E. 433; Archer on Oil and Gas, chap. 5, p. 92.

We do not question the soundness of this proposition of law.

The sole question for our determination, therefore, is, was there an abandonment of the lease by the defendants? In determining this question we must, for the reason hereinbefore stated, consider the lease as one entire lease upon the tract of land as a whole.

The lease provided that it should be operative for a period of 20 years from date, or as long as gas or oil should be found in paying quantities in and upon said land. It contained the surrender clause, and contained the provision: "If gas only is found in quantities large enough to transport, the parties of the first part are to receive $50.00 per year for the product of each well so transported and also free gas for dwelling on the land for heating and lighting purposes"; and provided: "If no well is commenced within 60 days from date of this lease, then the grant shall become null and void."

There is no contention that the latter provision was not met and satisfied, and all rights under the surrender clause have been abandoned; or that there was any request or demand for further development. The evidence conclusively showed that during the time that gas was transported from the well, that is, for a period of three and one-half years, the defendants paid $50 per year upon the well, and that thereafter free gas was furnished not only to the plaintiff for the dwelling upon the premises, but also was furnished to Mr. Patterson in his residence in the city of Blackwell up to the time of the trial in lieu of the annual payments, and that the gas so furnished in each instance was worth from $35 to $70 per annum. There is no contention that any drilling upon the premises had become necessary in order to protect the same against drainage, as there had been no development sufficiently near the premises to create such a demand. There was no provision in the lease that additional wells should be drilled, and no demand for additional wells was ever made.

The officers of the defendants testified that they had no intention of abandoning the premises. This testimony was competent. In Association v. Hetzel, 103 Pa. St. 507, it was said:

"Under the rule admitting parties to testify in their own behalf, where the character of the transaction depends on the intent of the party, it is competent for him to testify what his intention was."

In Thornton on Oil and Gas, sec. 155, vol. 1 (3rd. Ed.), it is said:

"The distinction between an abandonment and a forfeiture is often so thin as not to be distinguishable. And yet, broadly speaking, there is a difference, which may in a measure be stated thus: An abandonment rests upon the intention of the lessee to relinquish the premises and is therefore a question of fact for the jury; while a forfeiture does not rest upon an intent to release the premises, but is an enforced release."

In Lowther Oil Co. v. Miller Sibley Oil Co., 44 S. E. 433, the Supreme Court of West Virginia stated, in syllabus paragraph 3, as follows:

"To constitute abandonment by the lessee of the lease for oil there must be both the intention to abandon and actual relinquishment of the leased premises."

In 1 Cyc. 4 and 5, the rule is stated as follows:

"To constitute abandonment in respect of property, there must be a concurrence of the intention to abandon, and an actual relinquishment of the property, so that it may be appropriated by the next comer.* * * In determining whether one has abandoned his property or rights, the intention is the first and paramount object of inquiry; for there can be no abandonment without the intention to abandon."

As hereinbefore stated, the two cases were consolidated and the evidence taken, and at the conclusion of the trial the court rendered judgment in favor of the defendants in the Patterson Case, and refused to cancel the lease as to the south 80, and in the instant case rendered judgment canceling the lease as to the north 80. The issues in the two cases were the same; the testimony in the two cases was the same, except it was shown that Mrs. Whited, some ten days before filing her suit, gave notice to the defendant that she intended to avail herself of her rights in the surrender clause of the lease, and at which time she cut off the gas, and refused to accept same under the terms of the lease thereafter, but that circumstance becomes unimportant here for the reason, as has been stated, she has abandoned that theory upon appeal and the judgment in her favor in the court below must be sustained here, if at all, upon the theory that the defendant had abandoned the lease.

There was no conflict in the evidence upon the question of abandonment, and there be-

ing no evidence that the defendant ever intended to abandon the lease, and as there was no actual relinquishment of the property shown, it is clear to us that the conclusion reached by the trial court that the premises had been abandoned is erroneous, as there was no evidence to support the same.

The judgment is reversed, and the cause remanded for further proceedings in accordance with the views herein expressed.

All the Justices concur.